ALBERT E. PEACOCK III, CASB No. 134094
apeacock@peacockpiper.com
GLEN R. PIPER, CASB No. 204023
gpiper@peacockpiper.com
DAVID A. TONG, CASB No. 238971
dtong@peacockpiper.com
MARGARET STANDO, CASB No. 343038
mstando@peacockpiper.com
**PEACOCK PIPER TONG + VOSS LLP**
100 W. Broadway, Suite 610
Long Beach, CA  90802
Telephone: (562) 320-8880
Facsimile: (562) 735-3950


Attorneys for Plaintiff,
CAPETANISSA MARITIME CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA -WESTERN DIVISION

| In re the Matter of the Complaint of CAPETANISSA MARITIME CORPORATION, Owner of the Motor Vessel BEIJING, and her engines, tackle, apparel, and appurtenances, for Exoneration from, or Limitation of, Liability,<br><br>Plaintiff, | Case No.<br>Action Filed:<br><br>**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**<br><br>**[46 U.S.C. §§ 30502, et seq. and Federal Rule of Civil Procedure, Supplemental Rule F]**<br><br>**IN ADMIRALTY** |
| --- | --- |

///

///

///

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................. 1

II.   JURISDICTION AND VENUE .......................................... 5

III.  PARTIES ............................................................................ 6

IV.  FACTUAL ALLEGATIONS ............................................. 7

    A.   THE PIPELINE ........................................................ 7

    B.   DEVELOPMENT OF THE LONG BEACH OUTER
          ANCHORAGE ......................................................... 8

    C.   ONLY THE VESSEL TRAFFIC SERVICES FOR LOS
          ANGELES/LONG BEACH CAN SELECT THE ANCHORAGE
          LOCATIONS FOR VESSELS AT THE OUTER ANCHORAGE .......... 13

    D.   THE BEIJING JANUARY 2021 PORT CALL AT LONG BEACH ....... 14

          1.   The BEIJING's arrival at Long Beach on January 23,
              2021 ................................................................ 14

          2.   The January 25, 2021 "Unique and Severe" Heavy
              Wind Event .................................................... 15

          3.   The BEIJING was among the first vessels on January
              25, 2021 to attempt weighing anchor in order to sail
              from the  Outer Anchorage ............................ 17

          4.   The BEIJING portside anchor windlass unexpectedly
               failed when the crew attempted to weigh anchor ............. 18

          5.   Evasive maneuvers were performed while the
              BEIJING's crew undertook efforts to repair the
              windlass ......................................................... 19

///

**TABLE OF CONTENTS**

## <u>TABLE OF CONTENTS (Cont.)</u>

<u>PAGE</u>

6.    The BEIJING reported to VTS LA/LB and other vessels at the Long Beach Outer Anchorage that it was dragging anchor and that it was experiencing issues with its windlass ..................................................................20

7.    The BEIJING's termination of Voyage 084E.................................21

E.    THE AMPLIFY OIL SPILL OCCURS EIGHT MONTHS AFTER THE JANUARY 2021 HEAVY WIND EVENT ......................................22

F.    THE BEIJING WAS NEVER CLOSE TO THE PIPELINE CRACK LOCATION................................................................................25

G.    PLAINTIFF STATUS AS A "PARTY IN INTEREST" TO THE COAST GUARD'S MARINE CASUALTY INVESTIGATION OF THE AMPLIFY OIL SPILL ......................................................26

1.    Parties in Interest to Coast Guard Marine Casualty Investigations ..................................................................26

2.    Plaintiff *REQUESTED* designation as a PII to the Coast Guard's Marine Casualty Investigation ..........................................27

3.    The Amplify Defendants' PII Status Made Them Privy to Information Which Contradicts Their Verified Allegations Prior to Filing the Verified Amplify Complaint...........................................................................27

4.    The Amplify Defendants Grossly and Improperly Characterize the Conduct of the BEIJING'S Crew During the Pendency of the Coast Guard's Investigation................28

///

**TABLE OF CONTENTS**

**TABLE OF CONTENTS (Cont.)**

**PAGE**

H.  LITIGATION ARISING FROM THE AMPLIFY SPILL .......................29

    1.  Gutierrez, et al. v. Amplify Energy Corp., et. al., Case
        No. 8:21-cv-01628-DOC-JDE ......................................................29

    2.  The Amplify Defendants' Third-Party Action in the
        Gutierrez Case .........................................................................29

V. DEMAND FOR EXONERATION FROM OR IN THE ALTERNATIVE,
LIMITATION OF LIABILITY ....................................................................30

A.  FACTS AND BASIS GIVING RISE TO EXONERATION OF
PLAINTIFF ........................................................................................30

B.  FACTS AND BASIS GIVING RISE TO LIMITATION OF
PLAINTIFF'S LIABILITY ................................................................32

VI. PRAYER FOR RELIEF ...............................................................................35

**TABLE OF CONTENTS**

CAPETANISSA MARITIME CORPORATION, on its behalf and on behalf of its officers, employees, crew, agents, and managers (*"Plaintiff"*), as the Owner of the Motor Vessel BEIJING (the *"Vessel,"* or the *"BEIJING"*), by and through its undersigned attorneys, PEACOCK PIPER TONG + VOSS LLP, files this complaint for the purpose of initiating an action in which it seeks exoneration from, or in the alternative, limitation of its liability, either civil or maritime, in relation to the incidents described and alleged more fully herein.  Plaintiff's complaint (*"Complaint"* or *"Action"*) is filed pursuant to the Limitation of Liability Act of 1851, 46 U.S.C. §§30501, *et. seq.* (the *"Limitation Act"*).  Furthermore, this Complaint is filed within the admiralty or maritime jurisdiction of this Court.  Consequently, there is no right to a jury.

## I.    INTRODUCTION

This Action arises from the October 2, 2021, oil spill off the coast of Huntington Beach, California from Pipeline P00547 (the *"Amplify Oil Spill"*).  The Pipeline P00547 (the "*Pipeline"*) was owned by San Pedro Bay Pipeline Company (*"SPBPC"*), a wholly owned subsidiary of Amplify Energy Corporation (*"Amplify Energy"*).  The 42-year-old Pipeline transports oil from a processing platform ("*Elly*"), which is owned and operated by another Amplify Energy wholly owned subsidiary, Beta Operating Company, LLC ("*Beta Offshore*," together with Amplify Energy and SPBPC, the *"Amplify Defendants"*).  The Pipeline and Elly, along with two other platforms, make up the "*Beta Unit Complex*."   Amplify Energy was the designated "Responsible Party" for the Amplify Oil Spill under the Oil Pollution Action of 1990, 33. U.S.C. §§ 2701, *et seq.* ("*OPA*").

In the wake of the Amplify Oil Spill, the Amplify Defendants were criminally indicted in December 2021 for failing to properly respond to eight (8) separate alarms from the Pipeline's automated leak detection system, overriding the system, restarting and continuing to pump oil through the Pipeline in the face of the alarms, and understaffing the Elly platform with fatigued and undertrained personnel.

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

The Amplify Oil Spill gave rise to fourteen separate class actions, which were consolidated in the matter of *Gutierrez, Jr. et. al., v. Amplify Energy Corp., et al.*, Case No. 8:21-cv-01628-DOC-JDE (the "***Gutierrez Case***").  Plaintiff is among the several named defendants in the Gutierrez Case, as are the Amplify Defendants who, in turn, filed a verified Third-Party Complaint against Plaintiff and other parties (the *"**Verified Amplify Complaint**"*).  Both the operative, amended complaint in the Gutierrez Case (the "***Gutierrez FAC"***) and the Verified Amplify Complaint make several claims against Plaintiff, none of which withstand even the slightest examination or scrutiny.

Most critically, the Gutierrez FAC's and the Verified Amplify Complaint's central theory of liability against Plaintiff is that the crack in the Pipeline from which the Amplify Oil Spill flowed in early October 2021 was caused when the Pipeline was struck by the anchor of the containership owned by Plaintiff, the "***BEIJING***" or the **"Vessel,"** and/or another vessel – eight months earlier on January 25, 2021, during an extreme weather event, where the winds reached fifty miles per hour and the seas climbed to seventeen feet (the "***Heavy Wind Event***,*" see infra* § IV.D.2.)(*see* Gutierrez FAC, ¶ 69; *see also* Verified Amplify Complaint, ¶ 101.)

As an initial matter, all the allegations concerning the BEIJING's contact with the Pipeline are speculative and conjectural.  (*See e.g.*, Gutierrez FAC, ¶ 42 ("…on information and belief, the anchor-dragging incident damaged the subject pipeline"); *see also* Verified Amplify Complaint, ¶ 92.)  The only "evidence" alleged by the Class Action Plaintiffs and the Amplify Defendants is "AIS" data[1] purporting to show the BEIJING crossing **over** the Pipeline during the Heavy Wind Event.  (Gutierrez FAC, Image 10; Verified Amplify Complaint, ¶ 89.)

///

---

[1]     A commercial vessel's AIS "…provides vessel information, including the vessel's identity, type, position, course, speed, navigational status, and other safety-related information automatically to appropriately equipped shore stations."  33 C.F.R. § 164.01(a)(1).

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

However, that AIS data only conveys the position of the vessels (and more specifically, their AIS transponders) on the surface, not the location of their anchors. Put another way, the BEIJING's AIS data does not prove its anchor contacted the Pipeline approximately 100' below the surface, let alone caused the damage which led the Amplify Oil Spill.

But more to the point, the central theory of liability against Plaintiff is demonstrably false.  The Amplify Oil Spill's point of origin is a thirteen-inch crack in the Pipeline.  (Gutierrez FAC, Images 7 & 8.)  At paragraph 100 of the Verified Amplify Complaint, the Amplify Defendants identify the latitude and longitude coordinates of the "***Pipeline Crack Location***.":  33º38'58.1056" North (latitude) and 118º06'38.7240" West (longitude).  **The closest the BEIJING ever got to the Pipeline Crack Location during the Heavy Wind Event was approximately 210 meters or *over two football fields away.*** (*See infra* § IV.F.)

To distract from the complete absence of evidence that the BEIJING proximately caused the crack in the Pipeline or the Amplify Oil Spill, the Gutierrez FAC and the Verified Amplify Complaint offer several claims concerning the BEIJING's conduct, each of which is entirely baseless:

**(1)** **Federal law prohibited the BEIJING from anchoring close to the Pipeline.** (Gutierrez FAC, ¶ 204; Verified Amplify Complaint, ¶ 142).  These allegations betray a fundamental misunderstanding of the administration of the anchorage off the ports of Los Angeles and Long Beach.  The anchorage is subject to the plenary authority of the U.S. Coast Guard ("***Coast Guard***"), which has been responsible for the anchorage's development including the designated anchorage and contingency anchorage locations near the Pipeline.  (*See infra* §§ IV.B.)  Furthermore, as a matter of federal regulations, no commercial vessel may unilaterally select its anchorage location.  Rather vessels are ***assigned*** to specific, preexisting anchorages by the local Vessel Traffic Service.  Consistent with this scheme, the BEIJING anchored at the location assigned to it by the local Vessel Traffic Service.  (*See infra* §§ IV.C. &

- 3 -

D.1.)

**(2)** **The BEIJING negligently anchored near the Pipeline "… during a severe weather event."** (Verified Amplify Complaint, ¶ 144). This is false. As described in detail below, the weather was calm when the BEIJING anchored on January 23, 2021. (*See infra* § IV.D.1.)

**(3)** **The BEIJING "…broadcasted that [it was] 'at anchor,' while repeatedly crossing over the Pipeline.** (Gutierrez FAC, ¶ 67.) **The BEIJING failed to notify anyone of [its] anchor-dragging…"** (Verified Amplify Complaint, ¶ 131). Both allegations are patently false. On the morning of the January 25, 2021, the BEIJING's crew reported on open VHF radio broadcasts to Vessel Traffic Service and other vessels of their belief that the Vessel was dragging its anchor. (*See infra* § IV.D.6.) Importantly, Plaintiff believes that at least the Amplify Defendants were in possession of evidence establishing the BEIJING's reports of potential anchor dragging to Vessel Traffic Service prior to filing the Verified Amplify Complaint. Thus, they knew, or should have known, their allegations on this matter were false when that pleading was filed.

**(4)** **The BEIJING "chose to remain" at the anchorage during the Heavy Wind Event.** (Gutierrez FAC, ¶ 66.) The implication that the BEIJING chose to remain at anchor is improper. In fact, of the approximately twenty-four vessels (out of fifty) that sailed from the anchorage during the Heavy Weather Event, the BEIJING was among the very first to attempt to do so on January 25, 2021. However, during the anchor weighing operations, the Vessel's portside windlass (the large winch used to lower and raise the portside anchor) unexpectedly failed. (*See infra* § IV.D.3. & 4.)

**(5)** **Plaintiff's designation as a "Party In Interest" to the Coast Guard's marine casualty investigation into the Amplify Oil Spill infers liability on its part.** (Verified Amplify Complaint, ¶ 104.) Unlike the Amplify Defendants, the Coast Guard did not unilaterally designate Plaintiff as a "Party In Interest" to its marine casualty investigation into the cause Amplify Oil Spill. Rather, after learning about possible

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

connections between the BEIJING and the Amplify Oil Spill, Plaintiff decided to **request** such designation from the Coast Guard so that it could meaningfully participate in the investigation by calling and cross-examining witnesses. (*See infra* § IV.G.)

**(6)** **A member of the BEIJING crew refused to answer investigators' questions and "fled the country" during the pendency of the Coast Guard's investigation.** (Verified Amplify Complaint, ¶¶ 106 – 107.) Despite having not participated in the Coast Guard's investigation of the BEIJING, the Amplify Defendants offer this false, highly prejudicial, and scandalous accusation for the purpose of inferring a guilty conscience, motive, and liability upon the part of the BEIJING Defendants. The crew member in question, after sitting for numerous interviews with the Coast Guard, State, and local authorities, disembarked the BEIJING as previously scheduled at Long Beach in late November 2021. By the time the crew member signed off, he had been at sea aboard the Vessel for almost a year, after having his contract extended due to COVID-19 related complications.

Putting aside the Gutierrez Case's and the Verified Amplify Complaint's lack of merit, the claims asserted therein nevertheless expose Plaintiff to substantial exposure exceeding the BEIJING's value and pending freight at the end of the relevant voyage.

Neither the Class Action Plaintiffs nor the Amplify Defendants have evidence the BEIJING's anchor struck the Pipeline. Further, Plaintiff denies the BEIJING's anchor caused the thirteen-inch crack from which the Amplify Oil Spill belatedly flowed eight months later, or, even if it did, that it knew or had reason to know of that event. Thus, by this Action, Plaintiff seeks first adjudication exonerating it from all liability for the Amplify Oil Spill. Alternatively, if Plaintiff is not so exonerated, it seeks to limit its liability to $38,537,200.

## II.   <u>JURISDICTION AND VENUE</u>

1.     The Complaint is an action for exoneration from or, in the alternative, limitation of liability for civil and maritime claims which falls within the admiralty or maritime jurisdiction of this Court, Federal Rules of Civil Procedure 9(h) and 38(e), 28

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

U.S.C. § 1333, and Supplemental Rule F of the Supplemental Rules of Admiralty or Maritime Claims (collectively, "Admiralty Rules").

2.      The Complaint, and the claims asserted therein, are only cognizable in admiralty or maritime jurisdiction of this Court.  Thus there is no right to a jury.

3.      Venue is proper in this Court and District – the United States District Court for the Central District of California, Western Division – pursuant to Admiralty Rule F(9) because Plaintiff has already been sued in this District with respect to the Amplify Oil Spill, for which this Complaint seeks exoneration from, or limitation of, liability.

4.      On November 23, 2021, Plaintiff first received written notice that a potential claim may exist in relation to the Amplify Oil Spill.  Plaintiff files this Action within six months since it received that first written notice.

III.    **PARTIES**

5.      The BEIJING is a 109,149 gross ton, diesel-powered, Maltese-flagged, container cargo ship built in 2006 and bearing International Maritime Organization (IMO) number 9308508.  The BEIJING was formerly known as the "COSCO BEIJING."  At all relevant times, the Vessel is and was in all respects seaworthy, tight, staunch, strong, fully & properly manned, equipped and supplied, and fit for service for which it was engaged.

6.      At all relevant times, the BEIJING was and is owned by Plaintiff, a foreign corporation incorporated, organized, and existing under the laws of Liberia.

7.      At all relevant times, the BEIJING was and is under the technical management of experienced third parties, and Plaintiff was not involved in the selection or provision of the Vessel's Master, Officers, and other Crew.

8.      At all relevant times, Amplify Energy was and is a corporation organized under the laws of the state of Delaware.

9.      At all relevant times, Beta Offshore was and is a limited liability company organized under the laws of the state of Delaware.

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

10.     At all relevant times, SPBPC was and is a corporation organized under the laws of the state of California.

11.     The term "***Class Action Plaintiffs***," as used herein, shall refer collectively to all the named plaintiffs in the Gutierrez Case.

## IV.   FACTUAL ALLEGATIONS

### A.   THE PIPELINE

12.     With respect to the Pipeline, Plaintiff is informed and believes the following to be true.

13.     The Pipeline is a 16-inch, 17.3-mile-long common carrier pipeline first installed in 1980.

14.     Construction of the Pipeline was permitted by both U.S. Army Corps of Engineers representing federal interests, and the California Coastal Commission representing the State of California.

15.     The Amplify Defendants were on notice of the foreseeability of an anchor strike to the Pipeline prior to and after its installation.

16.     During the permitting process, concerns of a potential anchor strike or risks of other interference by shipping were raised and seemingly addressed by requiring that the Pipeline be buried in those areas where ships might be expected to anchor.

17.     For example, an Environmental Impact Report performed in advance of the Pipeline's installation observed that since the Pipeline "...will be vulnerable to damage from anchoring, particularly by large ships, it is important that the anchorage area be separated from the pipeline."

18.     To address these concerns, the Pipeline was permitted and constructed in such a way that it was to be buried 10-to-15 feet below the ocean floor inside the breakwater that sits offshore of the Ports of Los Angeles and Long Beach.

19.     The remainder of the offshore section of the Pipeline which was outside the breakwater heading seaward to the Beta Unit Complex (approximately 10.9 miles),

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

1   was left unburied on the ocean floor.

2        20.    A concrete coating was installed on the unburied section of the Pipeline.

3        21.    In 1992, dents in the Pipeline, possibly caused by anchor strikes, were

4   discovered, and repaired.[2]

5        22.    With respect to the Pipeline, the 2012 Oil Spill Prevention and Response

6   Plan for the Beta Unit Complex (the ***2012 Beta Response Plan***") states that it "…is

7   considered to be capable of causing significant and substantial harm to the environment

8   in the event of a discharge of oil because of its proximity to navigable waters …" [3]

9        **B.    DEVELOPMENT OF THE LONG BEACH OUTER ANCHORAGE**

10       23.    At all times relevant times, the Coast Guard had plenary authority to

11   regulate the anchorages off the Port of Los Angeles and Long Beach.

12       24.    In 1979, when the Pipeline was first proposed, the Coast Guard gave

13   notice that, "in view of the overcrowded anchorages," the Coast Guard was proposing

14   new anchorage *grounds* and *rules* for Los Angeles and Long Beach Harbors.  (44

15   Fed.Reg. 51620 (Sep. 4, 1979)).  One of the new anchorages was Commercial

16   Anchorage F, which is located outside the breakwater (the "***Outer Anchorage***").  (*Id.*)

17       25.    In May 1980, the Coast Guard finalized its proposed new anchorage rules,

18   noting that, "After publication of the proposed regulations a subsea crude oil pipeline

19   has been constructed within the harbors."  (45 Fed.Reg. 30431 (May 8, 1980)).

20       26.    In July 1980, NOAA updated Chart 18749 of the San Pedro Bay to show

21   the new Outer Anchorage and the Pipeline.

22

23   [2]    Theresa Bell, et al., *Overcoming the Challenges to Intelligently Pig the

24   Unpiggable, Platform Elly to Shore Oil Pipeline Case Study,* Prevention First 2008, pp.

25   6 & 12 (Sept. 2008), available at: https://www.slc.ca.gov/wp-
     content/uploads/2018/08/PF2008-

26   Pipeline-Overcoming.pdf.

27   [3]    The 2012 Beta Response Plan is available at:
     https://www.bsee.gov/sites/bsee.gov/files/oil-spill-response-plan-osrp/inspection-and-

28   enforcement/beta-operating-company-osrp-april-2012.pdf.

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR
EXONERATION FROM, OR LIMITATION OF, LIABILITY**

27.     In April 2004, the Coast Guard reconfigured the berths within the Outer Anchorage.  The total number of anchorage berths was reduced from 24 to 16 to allow for larger swing circles for larger ships.  (USCG District 11 Local Notice to Mariners No. 16/04 (April 20, 2004)).  In addition to making the anchorage berths larger, the center points of the anchorages (where vessels aim to drop their anchors), was moved away from the Pipeline.

28.     In November 2004, the Coast Guard proposed two further changes to the Outer Anchorage: (1) to increase the size of the anchorage area *overall*, and (2) to increase the size of each of the anchorage *berths* within the anchorage.  Specifically, the Coast Guard explained:

> Ships of increasing size are calling on the Port of Los Angeles and Long Beach. While in an anchorage area, these larger ships require watch circles of 1500 yards in diameter. Currently, the anchorage area outside the federal breakwater is made up of watch circles 1000 yards in diameter. An increase in the anchorage boundary would allow us to add three additional anchorages for vessels with watch circles of 1500 yards in diameter.

(Notice of Proposed Rulemaking, 69 Fed.Reg. 64549 (Nov. 5, 2004)).

29.     In 2006, the Coast Guard finalized its new rule for the Outer Anchorage. (71 Fed.Reg. 3001 (Jan. 19, 2006)).  However, the new rule addressed only the anchorage *boundaries* without any adjustment to the anchorages' *berths* within the Outer Anchorage.

///

///

- 9 -

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

1

2

30. The new rule pushed the boundary of the Outer Anchorage closer to the Pipeline.



**NOAA Chart 18749 (1980) showing Pipeline (green) in relation to Outer Anchorage boundary (yellow).**



**NOAA Chart 18749 (2006) showing Pipeline (green) in relation to Outer Anchorage boundary (yellow).**

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

31.     Plaintiff is informed and believes that the Coast Guard took no public or official action to utilize the new area in the southern portion of the Outer Anchorage for several years.  However, in minutes of the April 2013 meeting of the LA/LB Harbor Safety Committee, there was the following note:

> There was a question regarding the Sierra Foxtrot anchorages not being on nautical charts. Captain McKenna said they were developed with the Coast Guard approximately 10 years ago, that they are on the VTS's charts at the Marine Exchange, and that they were developed in part due to concern for a nearby pipeline. Lieutenant Commander Radiah Jones said that the Coast Guard was working on the matter, and Captain Jenkins said the Coast Guard would take the matter for action to follow-up.

32.     Two months later, in June 2013, the Coast Guard issued a chart correction to add three new anchorage berths within the Outer Anchorage, to wit: SF-1, SF-2, and SF-3.  (Coast Guard District Eleven, Local Notice to Mariners, No. 25/13 (19 Jun 2013)).  The new "*SF*" (or "*Sierra Foxtrot*") anchorage berths had radii of 650 yards – which is substantially smaller than what the Coast Guard prescribed in 2004, *see supra* ¶ 28. As shown in the below excerpt of a subsequent 2015 version of NOAA Chart 18479, the new "Sierra Foxtrot" anchorage berths (highlighted in red) were significantly closer to the Pipeline (highlighted in green).



**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

33. Plaintiff is informed and believes that the U.S Coast Guard neither sought nor obtained public comment on the addition of the Sierra Foxtrot anchorage berths within the Outer Anchorage.

34. At some point after 2015 but before January 2021, Plaintiff is informed and believes that based on the number of vessels anchored on January 25, 2021, the Coast Guard added 22 more anchorage berths – nearly doubling the number of anchorage spots for ships at the Outer Anchorage.

35. The Coast Guard has never published the location of the new anchorage berths.  There is no record of these anchorage positions in the Federal Register, in the Coast Guard's Local Notices to Mariners, in NOAA's Coast Pilot, nor on any publicly available chart.

36. Of particular importance as it relates to the BEIJING is contingency anchorage berth "SF-12," which is where the BEIJING was instructed to anchor on January 23, 2021.  As illustrated in purple below, this berth was also placed very close to the Pipeline by the Coast Guard.



**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

**C.** **ONLY THE VESSEL TRAFFIC SERVICES FOR LOS ANGELES/LONG BEACH CAN SELECT THE ANCHORAGE LOCATIONS FOR VESSELS AT THE OUTER ANCHORAGE**

37.     A Vessel Traffic Service ("*VTS*") is how the Coast Guard implements its regulatory framework to actively support the improvement of vessel safety and efficient movement through confined and busy waterways.

38.     Vessels and pilots within a VTS area of responsibility are required to utilize or comply with that service and must comply with VTS' instructions, directives, or orders. 46 USC § 70001.

39.     The VTS servicing the ports of Los Angeles and Long Beach is operated by a public/private partnership between the Coast Guard and the Marine Exchange of Los Angeles – Long Beach Harbor d/b/a the Marine Exchange of Southern California (the "*Marine Exchange*")("*VTS LA/LB*").

40.     VTS LA/LB exercises full Coast Guard "Captain-of-the-Port Authority" to enforce federal navigation and safety regulations within its area of responsibility, including the San Pedro Bay – where the ports of Los Angeles and Long Beach are located.  Thus, vessels and pilots within VTS LA/LB's area of responsibility are required to use its services and comply with its instructions, directives, and orders.

41.     Anchorage assignments in the ports of Los Angeles and Long Beach are the subject of federal regulations.  Specifically: "*All anchorages outside (seaward) of the federal breakwater will be assigned by the Los Angeles – Long Beach Vessel Traffic Information Service (VTIS) …*," i.e., VTS LA/LB.  (*See* 33 C.F.R. § 110.214(a)(1) "Los Angeles and Long Beach harbors," "General Regulations," "Anchorage Assignment." (Emphasis added)).

42.     Furthermore, in an August 13, 2020 Memorandum from the Captain of the Port for Sector LA/LB entitled "DELEGATION OF CAPTAIN OF THE PORT AUTHORITY FOR VTS OPERATIONS," the Captain of the Port "updated guidelines for implementing Captain of the Port authority by Coast Guard personnel assigned to

- 13 -

1  [VTS LA/LB].”  This document provides: **Anchorage Assignment:  I hereby**

2  **designate … authority to assign vessels to established <u>contingency</u> anchorages**

3  **within the Los Angeles-Long Beach Precautionary Area [33 C.F.R. 110.214], when**

4  **suitable federal anchorage is not available in an emergency situation.”  Emphasis**

5  **added).**

6      43.    In other words, commercial vessels (such as the BEIJING) which anchor

7  outside the breakwater off the ports of Los Angeles and Long Beach (as the BEIJING

8  did in January 2021) are assigned anchorages by VTS LA/LB.

9      **D.**    <u>**THE BEIJING JANUARY 2021 PORT CALL AT LONG BEACH**</u>

10      **1.**    <u>**The BEIJING's arrival at Long Beach on January 23, 2021**</u>

11      44.    On January 6, 2021, the BEIJING departed on voyage number 084E from

12  Xiamen, China to deliver containerized cargo at Long Beach, California.

13      45.    The BEIJING's commercial schedule, i.e., the ports at which it calls to

14  conduct cargo operations, was and is dictated entirely by the charterer of the Vessel, not

15  by Plaintiff.

16      46.    The Vessel arrived within VTS LA/LB's area of responsibility in the

17  evening of January 23, 2021.

18      47.    Plaintiff is informed and believes that due to the unprecedented port

19  congestion in January 2021, VTS LA/LB instructed the Vessel to anchor at the

20  uncharted, contingency anchorage SF-12 located in the San Pedro Bay.

21      48.    Neither Plaintiff, the Master, Officers, nor Crew of the BEIJING proposed,

22  selected, or requested contingency anchorage SF-12 as the location to drop and set the

23  BEIJING's anchor on January 23, 2021.  VTS LA/LB assigned the Vessel to that

24  anchorage.

25      49.    Once in position at contingency anchorage SF-12, the BEIJING obtained

26  final authority from VTS LA/LB to lawfully anchor there.

27      50.    The BEIJING properly completed anchoring with its portside anchor at

28  contingency anchorage SF-12 on January 24, 2021 at approximately 12:19 a.m. (local),

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR**
**EXONERATION FROM, OR LIMITATION OF, LIABILITY**

and then set and maintained a proper anchor watch at all relevant times thereafter.

51.     The Amplify Defendants' falsely claim that the BEIJING anchored during the Heavy Wind Event described in the next section of this Complaint.  (Verified Amplify Complaint, Introduction, p. 5, ll. 14 – 17 (The BEIJING anchored "…**during** a heavy wind event...").

52.     To the contrary, anchoring the BEIJING at contingency anchorage SF-12 was not contraindicated by the weather conditions during the late evening of January 23 or the early morning of January 24.  At the time of anchoring, the weather conditions were Force 2 on the Beaufort Scale, which is characterized by light breezes (approx. 4 - 6 knots) and small seas.

53.     Upon completion of anchoring operations, the crew of the BEIJING observed on its chart systems that the Vessel appeared to be anchored adjacent to an undersea pipeline.  The crew of the BEIJING contacted VTS LA/LB to confirm if the Vessel was anchored near an undersea pipeline and, if so, whether it was safe for the Vessel to remain at contingency anchorage SF-12.  In response to this inquiry, VTS LA/LB advised the BEIJING that it was anchored adjacent to an undersea pipeline but that it was safe for the Vessel to remain at contingency anchorage SF-12.

54.     The BEIJING experienced no issues with its anchor holding on January 24, 2021.  Throughout that day, the weather conditions never exceeded Force 4 on the Beaufort Scale, which is characterized by moderate breeze (approx. 11 - 16 knots) and small seas (approx. 1- 4').

### 2.     The January 25, 2021 "Unique and Severe" Heavy Wind Event.

55.     On or about January 24, 2021, VTS began advising ships within 25 nautical miles of San Pedro Bay via radio broadcasts to expect high winds later that evening and into the early hours of the next day, January 25, 2021.

56.     On January 24, 2021, there were more than 50 oceangoing vessels at anchor within the VTS LA/LB area of responsibility.

57.     Despite its warnings of high winds, VTS LA/LB did not at any time order

- 15 -

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

1    any vessels to leave their anchorages in response to, or in anticipation of, the forecasted

2    weather.

3        58.    On the evening of January 24, 2021, despite its own warnings and the

4    expected high winds, VTS LA/LB continued to assign and instruct vessels to anchor

5    within the San Pedro Bay.

6        59.    During early morning hours on or about January 25, 2021, while at anchor,

7    the BEIJING, along with the other vessels at anchor, began experiencing extremely

8    high winds estimated between 30 to 55 knots and eventually generating seas of over

9    seventeen (17) feet during the High Winds Event.

10        60.    Plaintiff is informed and believes that VTS LA/LB continuously monitored

11    vessel positions and contacted vessels if an alarm was triggered on the VTS LA/LB's

12    console that indicated when a ship might be dragging its anchor.

13        61.    On January 25, 2021, a significant number of vessels dragged anchor and

14    were contacted by VTS LA/LB regarding the same.

15        62.    As the intensity of the High Winds Event increased, VTS LA/LB began

16    instructing various vessels at anchor to place their engines on standby and be ready to

17    deploy a second anchor if needed to help hold position.

18        63.    Plaintiff is informed and believes that at no time on January 25, 2021, did

19    VTS LA/LB direct any vessel suspected of dragging its anchor to heave anchor and put

20    to sea, and that VTS LA/LB only instructed such vessels to place their engines on

21    standby and be ready to deploy a second anchor if needed to help hold position.

22        64.    Plaintiff is informed and believes that at no time on January 25, 2021, did

23    VTS LA/LB instruct any ship to drop a second anchor as a means to better hold its

24    ground.

25        65.    At approximately 4:30 a.m. on January 25, 2021, vessels which had been

26    anchored by VTS LA/LB at the Huntington Beach Anchorage collided.

27        66.    Plaintiff is informed and believes that at least 24 other vessels also heaved

28    anchor and put to sea on January 25, 2021.

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR
EXONERATION FROM, OR LIMITATION OF, LIABILITY**

67.     On January 26, 2021, the Executive Director of the Marine Exchange sent an e-mail to local shipping industry stakeholders characterizing the Heavy Wind Event as "*unique and severe*":

> Colleagues: I usually use this e-mail to send information to you on behalf of the CG, NOAA, USAF, etc. but this morning, *in the wake of the unique and severe weather conditions we had yesterday*, here's some info from the [Marine Exchange] you may find useful: **** The storm had 30 – 55 knot winds and 17 foot seas by our records.  24 ships departed anchorages for sea.  Some are returning to anchor; other remain drifting.  Either way, we work with each ships captain and they [sic][are] *carefully monitored and managed by* my wonderful MIS, VTS, and CG team of watchstanders. (Emphasis added).

### 3.     The BEIJING was among the first vessels on January 25, 2021 to attempt weighing anchor in order to sail from the Outer Anchorage

68.     At midnight between January 24 and January 25, 2021, the weather conditions at the anchorage remained Force 4 on the Beaufort Scale.  However, as noted above, the weather conditions began to rapidly degrade during the early morning of January 25, 2021.

69.     At approximately 3:50 a.m. (local) on January 25, 2021, the BEIJING's crew observed the increasing winds and took all reasonable precautionary and preventative measures including, but not limited to, ensuring the Vessel's main engines were on standby.

70.     Contrary to the allegations of the Class Action Plaintiffs' allegations, the BEIJING did not choose to remain at the anchorage during the Heavy Wind Event on January 25, 2021.  (*See e.g.,* Gutierrez FAC ¶ 66 (The BEIJING "chose to remain" at the anchorage.)

71.     In fact, of the approximately twenty-four (24) vessels (out of fifty (50)) that sailed from the anchorage during the Heavy Wind Event on January 25, 2021, the

- 17 -

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

1    BEIJING the first to attempt to do so, by approximately thirty minutes.

2        72.    At approximately 3:54 a.m. (local), the BEIJING's crew believed that due

3    to the rapidly increasing winds and seas, the Vessel lost the ability to hold its ground

4    and was possibly dragging its anchor.  In response, the crew immediately began to

5    prepare the Vessel's main engines and bow thruster.

6        73.    By approximately 4:02 a.m. (local), members of the BEIJING crew had

7    assembled at the Vessel's forward mooring station to begin the process of weighing the

8    Vessel's portside anchor.  By then, the weather conditions had deteriorated significantly

9    and were at least Force 8 on the Beaufort Scale, which is characterized by gale force

10   winds (approx. 34 – 40 knots) and waves ranging from 18 to 25'.

11       74.    Soon thereafter, at approximately 04:05 a.m. (local), the crew started to

12   weigh the portside anchor so that the BEIJING could depart the anchorage.

13       75.    Contrary to the allegations of both the Class Action Plaintiffs and the

14   Amplify Defendants, the BEIJING reported its belief that it might have been dragging

15   its anchor to VTS LA/LB.  (Gutierrez FAC, ¶ 67 (BEIJING reported it was "at anchor"

16   while crossing over Pipeline); Verified Amplify Complaint, ¶ 131 (BEIJING failed to

17   notify "anyone" of anchor-dragging.)

18       76.    Specifically, at approximately 4:04 a.m. (local), the BEIJING first reported

19   to VTS LA/LB its belief that it was dragging its anchor, and reported that it was

20   preparing its main engine, and that it would attempt to weigh anchor.  Additional

21   examples of the BEIJING's communications with VTS LA/LB and other vessels during

22   the Heavy Wind Event on January 25, 2021, are detailed below in Section IV.D.6.

23       77.    At approximately 05:17 a.m. (local), another vessel attempted to drop

24   anchor.  Again, per the foregoing federal regulatory authority, that could not have been

25   done without the express direction and approval of VTS LA/LB.

26              **4.    The BEIJING portside anchor windlass unexpectedly failed**

27              **when the crew attempted to weigh anchor**

28       78.    During portside anchor weighing operations, the BEIJING's portside

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR
EXONERATION FROM, OR LIMITATION OF, LIABILITY**

windlass (the large winch used by the Vessel to both raise and lower the portside anchor and to conduct mooring (i.e., dock line securing) operations), unexpectedly failed.

79.     Prior to the Vessel's January 23, 2021, arrival at the Outer Anchorage, the last time the Vessel anchored with its portside anchor (and thus dropped and weighed the anchor using the portside windlass) was on October 4, 2020, at Yantian, China.  The BEIJING experienced no issues with the operability of the windlass during the October 2020 anchorage at Yantian.

80.     The Vessel's portside windlass was subjected to routine checks and inspections on or about December 31, 2020, and January 1 and January 11, 2021, none of which identified deficiencies or issues with the operability of the equipment.

81.     Plaintiff is informed and believes that at least one other vessel experienced similar windlass operation issues when attempting to weigh anchor on January 25, 2021.

### 5.     Evasive maneuvers were performed while the BEIJING's crew undertook efforts to repair the windlass

82.     The only way for the crew to bring the BEIJING's portside windlass back on-line on January 25, 2021, was for them to replace its motor with the motor from the Vessel's starboard side windlass.

83.     The Vessel's windlass motors are extremely large themselves.  To move the Vessel's approximately 2,000-pound, starboard side windlass motor, the crew had to fabricate, rig, and weld a series of steel "A-frame" structures to the deck of the BEIJING.

84.     From these structures, the crew used chain falls, pulleys, and brute strength to lift the motor from the starboard side windlass and work it across the deck, all during the extreme conditions of the Heavy Weather Event, to the portside windlass.

85.     While the crew worked on the windlass at the mooring station, on the bridge, the Master and crew using the BEIJING's main engines and bow thruster,

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

performed maneuvers in order to maintain position in the course of good seamanship and prudent conduct in order to avoid collisions with other vessels anchored adjacent to it at the Outer Anchorage, avoid prejudice to safe navigation of those vessels, and to keep itself, its cargo, and its crew safe.

86.    The replacement of the portside windlass motor was completed at approximately 1:45 p.m. (local) on January 25, 2021.

6.    **The BEIJING reported to VTS LA/LB and other vessels at the Long Beach Outer Anchorage that it was dragging anchor and that it was experiencing issues with its windlass**

87.    Both the Class Action Plaintiffs and the Amplify Defendants have attempted to mischaracterize the conduct of the BEIJING in terms of what it reported to others during the Heavy Wind Event.

88.    The Amplify Defendants allege the BEIJING concealed it was dragging anchor.  (*See e.g.*, Verified Amplify Complaint, ¶ 96.)  The Class Action Claimants allege the BEIJING mispresented it was NOT dragging its anchor.  (*See* Gutierrez FAC, ¶ 67.)

89.    Both scenarios are demonstrably false.  During the Heavy Wind Event, the BEIJING reported to both VTS LA/LB and other vessels at the anchorage not only that it believed it was dragging anchor, but also that it was experiencing issues with its windlass:

| 4:04 a.m. | BEIJING reports to VTS LA/LB its belief it is dragging anchor and that it is preparing to weigh anchor. |
| --- | --- |
| 5:06 a.m. | BEIJING reports to VTS LA/LB that it is continuing to heave anchor. |
| 6:06 a.m. | BEIJING reports to VTS LA/LB that it is experiencing issues with its windlass.  BEIJING further confirms it is aware of a vessel off its starboard (right) side and that it will maintain its current position while tending to the windlass. |

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

| | |
|---|---|
| 6:15 a.m. | BEIJING again reports to VTS LA/LB that it is experiencing issues with its windlass and that the Vessel will maintain its current position while tending to the windlass. |
| 6:29 a.m. | BEIJING communicates with the vessel off its port (left) side. BEIJING advises it is using engines to provide distance between it and that vessel. |
| 6:34 a.m. | BEIJING communicates with vessel off its starboard side. BEIJING advises it is using engines to also provide distance between it, that vessel, and the vessel off the BEIJING's portside. |

90.    Each of these communications with VTS LA/LB and other vessels immediately adjacent to it at the anchorage were broadcast on VHF Channel 14, aka, "LA-Long Beach Traffic" or "San Pedro Traffic." (*See* 33 C.F.R. §110.214(a)(ii)).  All vessels anchored outside the federal breakwater must maintain a continuous radio watch of San Pedro Traffic, Channel 14.  (33 C.F.R. § 110.21(a)(3)(i)).

91.    Plaintiff is informed and believes that as Parties In Interest to the Coast Guard's marine casualty investigation into the Amplify Oil Spill (*see infra* <u>Section IV.G.</u>), the Amplify Defendants had access to the audio recordings of San Pedro Traffic, Channel 14 from January 25, 2021 confirming these communications prior to filing the Verified Amplify Complaint.  As a result, the Amplify Defendants knew or should have known its allegation at paragraph 96 of the Verified Amplify Complaint were false when that pleading was filed.

### 7.    <u>The BEIJING's termination of Voyage 084E</u>

92.    Upon successfully restoring the portside windlass, the BEIJING sailed from contingency anchorage SF-12 at approximately 24:00 (local) on January 25, 2021.

93.    On January 26, 2021, at approximately 3:19 p.m. (local), the Vessel anchored at anchorage HB3, again per the instructions of VTS LA/LB.  Using the

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

portside windlass, the BEIJING was able to drop and set its portside anchor without any issues.

94. On January 27, 2021, the BEIJING was able to successfully weigh its portside anchor using the portside windlass. That same day, the Vessel came alongside the berth at Long Beach at approximately 9:36 p.m. (local).

95. The Vessel remained at the berth to conduct cargo operations until February 8, 2021, when it sailed from Long Beach. Voyage 084E was terminated on that day.

**E.** **THE AMPLIFY OIL SPILL OCCURS EIGHT MONTHS AFTER THE JANUARY 2021 HEAVY WIND EVENT**

96. During the Amplify Oil Spill, it is estimated that 25,000 gallons of oil discharged from the Pipeline over the course of approximately fourteen (14) hours into the waters of the United States. The Amplify Oil Spill purportedly created a clean-up response zone of nearly thirteen (13) square miles.

97. The Amplify Oil Spill could have and should have been prevented by the Amplify Defendants. In fact, the Amplify Defendants have been criminally indicted by the U.S. Department of Justice. (*See*: https://www.justice.gov/usao-cdca/pr/three-companies-face-charges-negligent-conduct-during-offshore-oil-leak-damaged.)

98. The Amplify Defendants following conduct was also not just potentially criminal in nature, but inconsistent with the most basic principles of their own internal policies and procedures including, but not limited to, the 2012 Beta Response Plan, p. 2-18, which provides:

///

///

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

**In General – For Spill Response – Do Not Delay.**

**Plan Ahead.**

**Over-respond and stand down if necessary.**

**Do not get behind the curve.**

99.    The Amplify Defendants failed to provide sufficient training in spill response to its personnel in charge of Elly and the Pipeline on October 1 – 2, 2021.  In addition to this training deficit, the Amplify Defendants allowed Elly to be undermanned by fatigued personnel.  As result, the following calamitous series of events, which, based on the Department of Justice's indictment, Plaintiff is informed and believe transpired.

100.    At approximately 4:10 p.m. (local) on October 1, 2021, the first low-pressure alarm sounded, signaling a possible leak in the Pipeline indicated on Elly.  Elly's automated safety system shut down the pumping operation.

101.    Beta Offshore personnel on Elly failed to appreciate the significance of the initial 4:10 p.m. (local) alarm.  Apparently due to a lack of training provided by the Amplify Defendants, Beta Offshore's personnel on Elly that day disregarded the alarm and simply restarted their pumping operations without any effective investigation or other mitigation.

102.    Over the next several hours, Beta Offshore personnel ignored at least four (4) other subsequent leak detection alarms and automated forced shutdowns.  Like the first alarm at 4:10 p.m. (local) on October 1, 2021, the personnel on Elly made no appreciable effort to inspect the surface waters over, near, or adjacent to the Pipeline.  Rather, after every subsequent alarm and shutdown, the personnel on Elly apparently cleared the alarms, thereby resetting or bypassing safety features, and restarted pumping operations.

103.    The effect of restarting its pumps four (4) times after each of the alarms and shutdowns, resulted in oil discharging from the Pipeline for over three (3) hours.

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

104.   The personnel on Elly observed a sixth (6th) and then a seventh (7th) low pressure alarm at or about 10:01 and 11:15 p.m. (local) on October 1, 2021, respectively.  Again, the personnel on Elly simply restarted and pumped oil for an additional three hours, causing a further discharge of oil.

105.   In the predawn hours of October 2, 2021, and despite an eighth (8th) alarm at or about 5:28 a.m. (local), the personnel on Elly once again, simply restarted the system, and pumped oil for an additional half hour, causing a further discharge of oil.

106.   The personnel on Elly only finally shut down its pumping operation at 6:01 a.m. (local) on October 2, 2021, approximately fourteen (14) hours after the first low pressure leak detection alarm sounded at 4:10 p.m. (local) on October 1, 2021.

107.   By this time, all the oil discharged from the Pipeline during the Amplify Oil Spill had leaked out.

108.   The Amplify Defendants did not immediately report the Amplify Oil Spill, as required, to the National Response Center until 9:07 a.m. on October 2, 2021, over seventeen (17) hours after having received the first indication of a possible leak.

109.   The Amplify Oil Spill is not the first time an oil spill has occurred at the Beta Unit Complex due to alarm issues.  The 2012 Beta Response Plan, p. A-6, itself discusses an incident in 1999 when a crude line running from Elly and another platform (“*Eureka*”) in the Beta Unit Complex leaked, which caused Eureka to be closed for nine years.  Thereafter, an investigation determined that an electronic monitoring system that was supposed to detect leaks did not sound an alarm.[4]

110.   In the same year, 2,000 gallons of crude oil were spilled from the Beta Unit Complex into the Pacific Ocean, resulting in a $48,000 fine for the operators, although it is unclear whether that spill was connected to the Eureka shutdown.[5]

[4]   Deborah Schoch, *Seven Leaks Discovered in Shut-Off Pipeline*, LA TIMES (June 20, 1999, 12:00 a.m.), available at: https://www.latimes.com/archives/la-xpm-1999-jun-10-me-46179-story.html

[5]   CALIFORNIA NEWS TIMES, *OC oil spill: oil rig operator waited 3 hours to shut off*

- 24 -

111.   More recently, the Amplify Defendants were fined $85,000 in 2013 and 2014 for three separate incidents, one of which resulted in the release of oil into the Pacific Ocean.[6]

F.   **THE BEIJING WAS NEVER CLOSE TO THE PIPELINE CRACK LOCATION**

112.   In the immediate wake of the Amplify Oil Spill, the Coast Guard, along with other federal and California government investigators, in consultation with the Amplify Defendants determined, on or about October 4, 2021, that the source of the Amplify Oil Spill was a thirteen-inch (13') fracture to the Pipeline.

113.   At paragraph 100 of the Verified Amplify Complaint, the Amplify Defendants identify the latitude and longitude coordinates of the "***Pipeline Crack Location***.":  33º38'58.1056" North (latitude) and 118º06'38.7240" West (longitude).

114.   The Coast Guard requires large commercial vessels such as the BEIJING to be equipped with an Automated Identification System (AIS) standardized by the International Telecommunication Union and adopted by the International Maritime Organization (the "***IMO***").  *See* 33 C.F.R. § 164.01(a).  The IMO is the United Nations' specialized agency responsible for ship safety and security.  A commercial vessel's AIS "…provides vessel information, including the vessel's identity, type, position, course, speed, navigational status, and other safety-related information automatically to appropriately equipped shore stations."  33 C.F.R. § 164.01(a)(1).

115.   At all relevant times, the BEIJING was equipped with a fully functioning AIS.

116.   Historic data for all commercial vessels outfitted with AIS is available to

*damaged pipeline report says* (Oct. 6, 2021), https://californianewstimes.com/ocoil-spill-oil-rig-operators-waited-3-hours-to-shut-off-damaged-pipeline-reportsays/549529/.

[6]   Casey Tolan, *Operator of leaking oil infrastructure has record of violations*, CNN (Oct. 4, 2021, 12:14 p.m.), https://www.cnn.com/2021/10/04/us/betaoperating-company-violations/index.html

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

the public (including, for example, the Class Action Plaintiffs and Amplify Defendants) from numerous sources.

117.   Based on the BEIJING's publicly available AIS data, *the closest the BEIJING got to the Pipeline Crack Location during the Heavy Wind Event on January 25, 2021, was approximately 210 meters.*

118.   Consequently, the BEIJING was NOT the cause, proximate or otherwise, of the 13" crack in the Pipeline, the Amplify Oil Spill, or the alleged damages sustained by the Class Action Plaintiffs and Amplify Defendants.

G.   **PLAINTIFF STATUS AS A "PARTY IN INTEREST" TO THE COAST GUARD'S MARINE CASUALTY INVESTIGATION OF THE AMPLIFY OIL SPILL**

1.   **Parties In Interest to Coast Guard Marine Casualty Investigations**

119.   Pursuant to 46 U.S.C. §§ 6301 – 6309 and 46 C.F.R. §§ 4.07-1 – 4.0755, the Coast Guard has broad powers to investigate "marine casualties," as that term is defined in 46 C.F.R. § 4.03-1.

120.   Exercising this authority, the Coast Guard, Sector Los Angeles – Long Beach, commenced a marine casualty investigation into the cause of the Amplify Oil Spill.

121.   Pursuant to 46 C.F.R. § 4.03-10, the "…term *party in interest* shall mean any person whom the … investigating officer shall find to have a direct interest in the investigation conducted by it and shall include an owner, a charterer, or the agent of such owner or charterer of the vessel or vessels involved in the marine casualty …, whether or not involved in a marine casualty …. under investigation by the … investigating officer." (Emphasis in original).

122.   Parties In Interest, or "***PII***," are allowed to be represented by counsel, to cross-examine witnesses, and to call witnesses. 46 U.S.C. § 6303; 46 C.F.R. § 4.07-35.

123.   The Coast Guard designated the Amplify Defendants and the owners of

- 26 -

another vessel as PII in its investigation of the Amplify Oil Spill in October 2021.

### 2. **Plaintiff *REQUESTED* designation as a PII to the Coast Guard's Marine Casualty Investigation**

124. Plaintiff was ***not designated as PII*** at the time the Amplify Defendants and the owner of the other vessel were designated.

125. However, a party not unilaterally designated as a PII to a marine casualty investigation may ***request*** designation. *See* Coast Guard Investigation (CG-INV) Policy Letter, p. 2, (Jan. 14, 2014). PII

126. In or around late October 2021, Plaintiff became aware of the BEIJING's potential connection to the Amplify Oil Spill vis-à-vis the Heavy Wind Event through the media.

127. Plaintiff also learned through the media that the owner of the other vessel potentially connected with the Amplify Oil Spill vis-à-vis the Heavy Wind Event had been designated as a PII.

128. Considering the foregoing, Plaintiff ***requested*** that the Coast Guard designate it as a PII so it could defend its interests by participating meaningfully in the agency's investigation.

129. On or about November 17, 2021, the Coast Guard ***granted the request*** of Plaintiff to be designated as a PII.

### 3. **The Amplify Defendants' PII Status Made Them Privy to Information Which Contradicts Their Verified Allegations Prior to Filing the Verified Amplify Complaint.**

130. Again, the Amplify Defendants were designated as PIIs to the Coast Guard's investigation prior to them, perhaps as soon as early October 2021.

131. As such, Plaintiff is informed and believes that the Amplify Defendants obtained, on or around that time and certainly prior to the February 28, 2022 filing of the Verified Amplify Complaint, access to data and information which establishes allegations in that verified pleading were, in fact, not true.

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

132.   This data and information includes an audio and video playback from VTS LA/LB's console from approximately 3:00 a.m. to 6:00 a.m. (local) on January 25, 2021.

133.   In the audio playback of VTS LA/LB's console, the BEIJING is heard confirming to VTS LA/LB at approximately 4:03 a.m. (local) that it was "dragging anchor." (*See supra* § IV.D.6.)

134.   Notwithstanding having access to this data and information for several months prior to filing the Verified Amplify Complaint, the Amplify Defendants nevertheless frequently allege that the BEIJING <u>did not</u> report its anchor-dragging. (*See e.g.*, Amplify Complaint, ¶ 96.)

    **4.**    <u>**The Amplify Defendants Grossly and Improperly Characterize the Conduct of the BEIJING'S Crew During the Pendency of the Coast Guard's Investigation**</u>

135.   Finally, in the Verified Amplify Complaint, the Amplify Defendants repeatedly and improperly suggest Plaintiff is liable because one of the BEIJING's crew members "fled the country during the Coast Guard's investigation. (*See e.g., Verified Amplify Complaint, Introduction, p. 5, ll. 9 – 10.)*

136.   This is patently false.  As an initial matter, no representative of any of the Amplify Defendants participated in the Coast Guard's investigation of the BEIJING.

137.   Furthermore, the crew member in question was scheduled to disembark the BEIJING when it called at Long Beach in late November 2021.  This was only after the crew member's contract aboard the Vessel had been extended due to COVID-19 related manning issues.

138.   By the time the crew member disembarked the BEIJING at Long Beach, he had been at sea **for almost a year**.

139.   More importantly, prior to disembarking the Vessel, the crew member sat for interviews with the Coast Guard, State of California, and local authorities.  He did not flee the United States.

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

**H.    LITIGATION ARISING FROM THE AMPLIFY SPILL**

      **1.    Gutierrez, et al. v. Amplify Energy Corp., et. al., Case No. 8:21-cv-01628-DOC-JDE**

140.    On January 28, 2022, the Class Action Plaintiffs asserted claims when they filed their Consolidated Class Action Complaint in the Gutierrez Case, naming, among others, Plaintiff as a defendant.

141.    On or about April 21, 2022, the Class Action Plaintiffs filed the Gutierrez FAC naming, among others, Plaintiff and the Vessel, *in rem*, as defendants.

142.    With the Gutierrez FAC, which asserts exclusively California state law, tort-based claims against Plaintiff, the Class Action Plaintiffs seek an unspecified amount of recovery.

143.    However, Plaintiff is informed and believes that the amount sought may be in the hundreds of millions of dollars.

      **2.    The Amplify Defendants' Third-Party Action in the Gutierrez Case**

144.    On February 28, 2022, the Amplify Defendants filed the Verified Amplify Complaint in the Gutierrez Case naming, among others, Plaintiff as a third-party defendant.

145.    The Verified Amplify Complaint seeks contribution for removal costs and damages under OPA, but also asserts non-OPA claims for damages associated with the loss of revenue and damage to the Pipeline.

146.    The Verified Amplify Complaint does not provide a specified sum of its alleged damages sought against Plaintiff.

147.    However, Plaintiff is informed and believes that the amount sought by the Amplify Defendants may also potentially be in the hundreds of millions of dollars.

///

1

**V.**    <u>**DEMAND FOR EXONERATION FROM OR IN THE ALTERNATIVE,**</u>

2

<u>**LIMITATION OF LIABILITY**</u>

3

     **A.**    <u>**FACTS AND BASIS GIVING RISE TO EXONERATION OF**</u>

4

<u>**PLAINTIFF**</u>

5

     148.    Paragraphs 1 through 147 above are incorporated by reference as though

6

fully stated herein.

7

     149.    Under the Limitation of Liability Act of 1851, a vessel owner is entitled to

8

exoneration if the owner, the vessel, and the crew are shown to be free of fault.

9

*Northern Fishing & Trading Co., Inc. v. Grabowski*, 477 F.2d 1267, 1272 (9th

10

Cir.1973) ("The whole doctrine of limitations of liability presupposes that a liability

11

exists which is to be limited. If no liability exists there is nothing to limit."); *see also*

12

*Matter of Hechinger*, 890 F.2d 202, 207 (9th Cir. 1989).

13

     150.    The applicable standard of care under U.S. general maritime law stems

14

from traditional concepts of prudent seamanship, reasonable care, observance of

15

statutory and administrative rules, and recognized customs and uses.

16

     151.    At all relevant times, the BEIJING was in all respects seaworthy, and

17

Plaintiff, the Master, and the Vessel's crew acted with due care, free of any negligence

18

or fault.

19

     152.    While waiting to enter port, the primary duty of a cargo vessel like the

20

BEIJING is to follow the lawful orders and directions of VTS.

21

     153.    In the instant case, the Vessel was on a voyage to deliver cargo to the Port

22

of Long Beach, California and arrived within VTS LA/LB's area of responsibility on

23

January 23, 2021. Due to unprecedented port congestion, VTS LA/LB instructed the

24

Vessel to anchor in federal waters of the United States, and more specifically at the SF-

25

12 contingency anchorage within San Pedro Bay.

26

     154.    The Vessel followed all mandates and orders of VTS LA/LB and was not

27

at any time in violation of any statutory or administrative rule.

28

     155.    In the instant case there is no evidence of a breach of any duty by the

Vessel.

156.    There is no evidence that any action by Plaintiff played any causal role in the Amplify Oil Spill.

157.    There is no evidence that any action by the BEIJING played any causal role in the Amplify Oil Spill.

158.    There is no evidence that the BEIJING's anchor contacted the Pipeline on January 25, 2021.

159.    The Class Action Plaintiffs and Amplify Defendants acknowledge that their claims against the BEIJING and Plaintiff lack evidence of physical contact; each of their respective claims are purely conjectural based only on "information and belief."

160.    Critically, the closest the BEIJING came to the Pipeline Crack Location on January 25, 2021, was approximately 210 meters.

161.    Even if the BEIJING's anchor came into contact with the Pipeline on January 25, 2021, which is denied, Class Action Plaintiffs and Amplify Defendants do not and cannot demonstrate that such contact was the proximate cause of the crack found on the Pipeline which is the source of the Amplify Oil Spill over eight (8) months later.  This time discrepancy undermines and negates any possibility that contact between the BEIJING's anchor and the Pipeline played any causal role in the Amplify Oil Spill and ignores other possibilities including other heavy weather or high wind events in which other vessels may have dragged or dropped anchor as well as the effects of subsurface currents and seismic activity.

162.    Moreover, even if the BEIJING's anchor came into contact with and damaged the Pipeline, the BEIJING's actions taken to maintain position and station keeping were performed in the course of good seamanship and prudent conduct in order to avoid collision with other ships, avoid prejudice to the safe navigation of those ships, and to keep itself, its cargo, and its crew safe, and doing so was reasonable under the circumstances.

163.    The BEIJING owed no duty to advise the Amplify Defendants that it

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

passed one hundred feet above the supposed location of the Pipeline as this was plainly known, reported to, and acknowledged by VTS LA/LB.

164.   Thus, Plaintiff is free of fault and entitled to exoneration from liability.

165.   Even if Plaintiff was not free of fault, it is entitled to exoneration because the Amplify Oil Spill was proximately caused by the negligence, in whole or in part, superseding and/or intervening, or in some combination thereof, of the Amplify Defendants and/or other third parties for which Plaintiff is not liable.

166.   The Amplify Defendants failed to act reasonably when failing to timely shut down pumping operations and investigate the cause of no less than 8 low pressure alarms and automated leak detection features over the course of a 14-hour period. The alarms alerted them to the Amplify Oil Spill, and reasonably prudent operators would have stopped pumping oil into the Pipeline thereby substantially minimizing any damage.  Even after the Amplify Oil Spill was discovered, Beta Offshore's supervisors and the other Amplify Defendants inexplicably delayed reporting it for nearly three hours, in contravention of law and their own written policies and procedures.

167.   Accordingly, because the actions and/or omissions of Captanissa, if any, are not the proximate cause of the Amplify Oil Spill, Plaintiff is still entitled to, and hereby demands, full exoneration.

**B.   <u>FACTS AND BASIS GIVING RISE TO LIMITATION OF PLAINTIFF'S LIABILITY</u>**

168.   Paragraphs 1 through 167 above are incorporated by reference as though fully stated herein.

169.   A claimant against Plaintiff and the BEIJING in the instant case must demonstrate (1) a duty owed; (2) breach of that duty; (3) injury; and (4) a causal connection (proximate cause) between the breach and the injury.

170.   While not in any manner admitting liability for any injuries or damages which any claimant or representative might allege they have suffered, and hereby expressing its desire to contest liability, Plaintiff desires first to be completely

- 32 -

exonerated from any and all such claims, and, if not so exonerated, in the alternative, to limit it liability, if any, for any and all said claims, to all claimants, to a maximum of liability equivalent to  Plaintiff's interest in the BEIJING and pending freight, at the termination of Voyage 084E.

171.   Plaintiff hereby claims the benefits of exoneration from, or limitation of, liability provided for in the Limitation Act, as amended and supplemented by the rules governing admiralty proceedings in this Court.  Plaintiff also claims the benefit of any other act and/or statute of the United States to which it may be entitled.

172.   In furtherance of limitation, Plaintiff asserts that the voyage (No. 084E) on which the said alleged allision occurred and upon which the Class Action Plaintiffs and Amplify Defendants initiated claims, demands and proceedings sought to be limited, began in Xiamen, China on January 6, 2021, upon the Vessel's departure, and was terminated in Long Beach, California on or about February 8, 2021, upon conclusion of cargo discharge operations and departure from Long Beach.

173.   As evidenced by the attached Declaration of Glen R. Piper Regarding Vessel Value, the value of the Vessel on the Voyage End Date was $38,000,000. Attached hereto as **Exhibit "1"** is a true and correct copy of Mr. Piper's Declaration.

174.   As evidenced by the attached Declaration of John Harry Webster Regarding Then-Pending Freight Value, the value of the pending freight on the Voyage End Date was $537,200.  Attached hereto as **Exhibit "2"** is a true and correct copy of Mr. Webster's Declaration.

175.   Based Mr. Piper's and Mr. Webster's Declarations, Plaintiff is therefore informed and believes, and alleges that the total value of the Vessel and its pending freight upon the termination of Voyage 084E was $38,537,200.

176.   Plaintiff is informed and believes that the amount of estimated damages alleged against them and the BEIJING is in the hundreds of millions of dollars and will exceed the value of Plaintiffs' interests in the BEIJING and then-pending freight at the Voyage End Date.

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

177.   Plaintiff contemporaneously files herewith an *Ad Interim* Stipulation of Value, in the form of a Letter of Undertaking issued by The Swedish Club, for its interest in the Vessel plus the freight pending at the Voyage End Date, with interest at the legal rate of six percent (6%) per annum, plus security for costs in the amount of $1,000, as required by LAR 83-F.1, or whichever amount may later be ordered by this Court.

178.   Upon information and belief, there are no actions or proceedings pending in contract arising from the Amplify Oil Spill.

179.   Plaintiff is informed and believes that no vessel arrest or attachment has been filed against the Vessel.

180.   The Amplify Defendants and one other shipping group asserted maritime liens based in tort against the Vessel for which they have accepted security in the amount of $68 Million which by operation of law and terms would be subsumed and/or extinguished in this Action.

181.   Plaintiff has a good faith basis and grounds to believe that in addition to the claims asserted in the Gutierrez FAC and the Verified Amplify Complaint, other claims will be made, and that suits or actions will be commenced against them by persons or entities claiming to have sustained damages as a result of the Amplify Oil Spill in amounts, when taken in the aggregate, exceed the total sum of the value of the BEIJING and then-pending freight which without the protection of appropriate limitation law, Plaintiff may be required to pay.

182.   The Vessel remains in operation, and has not been damaged, lost or abandoned.  The incidents and events alleged in the Gutierrez FAC and the Verified Amplify Complaint, and any consequent injuries or damages resulting therefrom, were done, occasioned, and incurred without any unseaworthiness of the Vessel.

183.   At all relevant times, due diligence was exercised to make the BEIJING in all respects seaworthy and properly manned, equipped and supplied.

184.   The incidents and events alleged in the Gutierrez FAC and the Verified

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

Amplify Complaint, and any consequent injuries or damages resulting therefrom, were done, occasioned, and incurred without the privity or knowledge of Plaintiff, or anyone for whom it may be responsible, at or prior to commencement of the above-described Voyage.

185.   The aforementioned damages were not caused or contributed to by any fault or neglect on the part of Plaintiff, and any consequent injuries or damages, resulting therefrom, were solely and proximately caused by the fault and/or neglect of others, including, but not limited to, the Amplify Defendants and any and all claimant(s) who may have failed to avoid and/or mitigate their damages.

186.   Plaintiff alleges that it has valid, absolute and complete defenses to any and all alleged liability arising out of the Amplify Oil Spill on the facts and under maritime and admiralty law.

187.   Plaintiff reserves its rights pursuant to *Federal Rules of Civil Procedure*, Rule 15 to amend and supplement its Complaint as the Court and justice so requires.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.      That the Court enter an order approving the aforementioned *Ad Interim* Stipulation of Value deposited with the Court by Plaintiff as security for the amount or value of their interests in the Vessel and then-pending freight.

2.      That the Court, upon issuance of a monition, enter an order staying and restraining the prosecution of any and all suits against Plaintiff and/or the Vessel which may have already been commenced by any person or entity to recover damages as a result of the Amplify Oil Spill, and for which this Complaint seeks exoneration from or limitation of liability, and retraining the commencement and prosecution of any additional or unknown lawsuits, whether new or old, or any legal proceeding whatsoever, against Plaintiff and/or the Vessel, with respect to any claims arising from the Amplify Oil Spill and for which this Complaint seeks exoneration from or limitation of liability;

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

3.     That the Court enter an order directing the issuance of a formal notice in the form of a monition to all persons asserting claims against Plaintiff and/or the Vessel with respect to the Amplify Oil Spill and for which this Complaint seeks exoneration from, or limitation of, liability, admonishing and instructing them to file their respective claims with the Clerk of this Court, to serve a copy of the same on counsel for Plaintiff, and to appear and answer the allegations of this Complaint, on or before a date to be fixed by the Court in the order;

4.     That the Court enter an order directing the execution of the monition and publication of the same in such newspaper as the Court may direct, once a week, for four (4) consecutive, successive weeks prior to the date fixed by the Court for the filing of such claims, all as provided for in the law and by Rule F(4) of the Federal Rules of Civil Procedure, Supplemental Rules for Certain Admiralty and Maritime Claims;

5.     That the Court permit Plaintiff to contest its liability, if any, for all injuries and/or damages arising out of the Amplify Oil Spill and for which this Complaint seeks exoneration from or limitation of liability and that this Court in this proceeding adjudge that Plaintiff and the Vessel are to be completely exonerated from liability arising out of the Amplify Oil Spill and for which this Complaint seeks exoneration from or limitation of liability;

6.     In the event it is found by this Court that liability exists on the part of Plaintiff and/or the Vessel, by reason of the injuries and damages to any claimant, then the Court, in this proceeding, adjudge that such liability shall in no case exceed the amount of the value of Plaintiff's interest in the BEIJING and pending freight on the Voyage End Date; and

///

///

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**

7.    That Plaintiff receives such other and further relief as the Court may deem just and proper under the circumstances.

DATED:  May 20, 2022                    /s/ Albert E. Peacock, III
                                        ALBERT E. PEACOCK III
                                        GLEN R. PIPER
                                        DAVID A. TONG
                                        MARGARET STANDO
                                        **PEACOCK PIPER TONG + VOSS LLP**
                                        Attorneys for Plaintiff,
                                        CAPETANISSA MARITIME CORPORATION

**CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR
EXONERATION FROM, OR LIMITATION OF, LIABILITY**

# EXHIBIT "1"

1  ALBERT E. PEACOCK III, CASB No. 134094
2  apeacock@peacockpiper.com
   GLEN R. PIPER, CASB No. 204023
3  gpiper@peacockpiper.com
4  DAVID A. TONG, CASB No. 238971
   dtong@peacockpiper.com
5  MARGARET STANDO, CASB No. 343038
6  mstando@peacockpiper.com
   **PEACOCK PIPER TONG + VOSS LLP**
7  100 W. Broadway, Suite 610
8  Long Beach, CA 90802
   Telephone: (562) 320-8880
9  Facsimile: (562) 735-3950

10

11

12            **UNITED STATES DISTRICT COURT**

13     **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

14

| | |
|---|---|
| In re the Matter of the Complaint of CAPETANISSA MARITIME CORPORATION, Owner, of the Motor Vessel BEIJING, and its engines, tackle, apparel, and appurtenances, for Exoneration from, or Limitation of, Liability,<br><br>                Plaintiff, | **Case No.**<br>*Action Filed:* **MAY 20, 2022**<br><br>**DECLARATION OF GLEN R. PIPER REGARDING VESSEL VALUE FOR PURPOSES OF LIMITATION OF LIABILITY**<br><br>IN ADMIRALTY |

21  I, GLEN R. PIPER, declare as follows:

22      **1.**     I am an attorney licensed to practice before all of the State and Federal

23  Courts of California.  I am a partner with the law firm Peacock Piper Tong + Voss LLP,

24  counsel for Plaintiff Capetanissa Maritime Corporation (hereinafter "*Capetanissa*") in

25  the above-entitled action.

26      **2.**     I submit this declaration in support of Capetanissa's Complaint in an

27  action for exoneration from, or in the alternative, limitation of liability, either civil or

28  maritime, pursuant to the Limitation of Liability Act of 1851, 46 U.S.C. §§30501, *et.*

                                    - 1 -

1  *seq.* (hereinafter "***Limitation Action***").  Unless stated otherwise, this declaration is

2  based upon my personal knowledge.  As to those matters stated upon information and

3  belief, I believe them to be true.

4      **3.**    In support of Capetanissa's Limitation Action, I sought two valuations for

5  the vessel M/V BEIJING (hereinafter "***BEIJING***") from specialists in the sale,

6  purchase, finance, construction and appraisals of vessels.

7      **4.**    The BEIJING is a diesel-powered container vessel with an approximate

8  gross tonnage of 109,149, registered under the laws of Malta, and bearing International

9  Maritime Organization (IMO) number IMO 9308508.

10      **5.**    I am informed and believe that the voyage at issue, known as "Voyage

11  084E" (hereinafter, the "***Voyage***") ended when the BEIJING departed the Port of Long

12  Beach upon the completion of cargo operations and it began a new voyage to China on

13  8 February 2021, thus terminating the Voyage on 8 February 2021 (hereinafter the

14  "***Voyage End Date***").

15      **6.**    On behalf of Capetanissa, as Owner of the BEIJING, my firm retained and

16  requested independent vessel valuations from Compass Maritime Services, LLC

17  ("Compass") and Jacq Pierot Jr. & Sons Inc. ("Pierot") for purposes of determining

18  Capetanissa's interest in the BEIJING on the Voyage End Date of February 8, 2021.

19  Compass and Pierot are recognized experts in providing vessel valuations and have

20  extensive experience in appraising vessels on behalf of vessel owners, buyers, banking

21  institutions, investors and lenders.

22      **7.**    I am informed and believe that Compass was established in 2000 and is

23  based in the United States.  I am further informed and believe it has an extensive record

24  of appraising vessels and shipping assets on behalf of ship-owners and operators,

25  attorneys and financial institutions (including commercial lenders, equity investors,

26  leasing companies, etc.).  In addition to acting as brokers for the purchase and sale of

27  ships and offshore vessels, I am informed and believe Compass provides hundreds of

28  ship valuations each year and its brokers have provided testimony in United States

**DECLARATION OF GLEN R. PIPER REGARDING VESSEL VALUE FOR
PURPOSES OF LIMITATION OF LIABILITY**

courts and legal proceedings regarding vessel valuations.  Compass is one of ten worldwide panel members on the Baltic Exchange Sale & Purchase Assessment Panel (BSPA) and one of six panel members of the Baltic Exchange Demolition Assessment Panel (BDA).  (*See*: https://compassmar.com/Compass_Maritime_Ships_Valuations .html).

**8.**     I am informed and believe that Pierot was originally founded in 1894 in Rotterdam, Netherlands and later relocated to New York City in the late 1940's where it currently maintains its offices.  I am further informed and believe that Pierot is recognized as one of the industry's leading appraisers of vessels, retained for such services by ship owners, foreign and domestic government agencies (including the Department of Transportation/Maritime Administration (MARAD), the Military Sealift Command/U.S. Navy (MSC)), domestic and foreign banks, leasing and insurance companies, and other institutions connected to the maritime industry.  I am informed and believe that Pierot brokers have testified before admiralty and civil courts, both in the United States and abroad and are one of the four founding members (and the only non-European representative) of the International Ship Valuation Panel (ISVP). (*See*: https://www.pierotshipping.com/valuations).

**9.**     I am informed and believe that to determine the BEIJING's value on the Voyage End Date, Compass and Pierot independently considered, among other things, the year the BEIJING was built, the location where it was built, her type as a container vessel, size, Twenty-foot Equivalent Unit (TEU) capacity, her sound and seaworthy condition, the vessel market at the point in time of the valuation, other vessel sales and its classification society status.

**10.**     After completing its analysis which included, but was not limited to those items outlined above, Compass concluded the BEIJING's value on the Voyage End Date was Thirty-Six Million U.S. Dollars ($36,000,000) and it provided a Valuation Certificate in support of this valuation.  Attached hereto as Exhibit "A" is a true and correct copy of the Valuation Certificate issued by Compass for the BEIJING as of the

- 3 -

**DECLARATION OF GLEN R. PIPER REGARDING VESSEL VALUE FOR PURPOSES OF LIMITATION OF LIABILITY**

Voyage End Date on February 8, 2021.

11.     After completing its analysis which included, but was not limited to, those items outlined above, Pierot concluded the BEIJING's value on the Voyage End Date was Forty Million U.S. Dollars ($40,000,000) and it provided a Valuation Certificate in support of this valuation.  Attached hereto as Exhibit "B" is a true and correct copy of the Valuation Certificate issued by Pierot for the BEIJING as of the Voyage End Date on February 8, 2021.

12.     Based on the above Valuation Certificates issued by these two independent entities with expertise in adjudging the present and historic value of vessels, Plaintiff suggests that the average of the two valuations provides the reasonable value of the BEIJING on the Voyage End Date of February 8, 2021 at Thirty-Eight Million U.S. Dollars ($38,000,000).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 20th day of May 2022, in Long Beach, California.

_____
GLEN R. PIPER

**DECLARATION OF GLEN R. PIPER REGARDING VESSEL VALUE FOR PURPOSES OF LIMITATION OF LIABILITY**

# EXHIBIT "A"



# COMPASS MARITIME SERVICES
### SPECIALISTS IN THE SALE, PURCHASE AND VALUATION OF SHIPS AND OFFSHORE VESSELS

# INDEPENDENT VALUATION REPORT

May 18, 2022

Valuation of mv "BEIJING"

To the attention of:

Peacock Piper Tong & Voss LLP
100 West Broadway Suite 610,
Long Beach, CA 90802

### COMPASS MARITIME - Valuation Credentials

The Compass Maritime Services brokerage team has an extensive record of appraising vessels and shipping assets on behalf of ship owners and operators, banks and financial institutions, attorneys, and insurance companies throughout the world. In addition to acting as brokers for the buying and selling of ships and offshore vessels, the team provides hundreds of ship valuations each year to its clients.

Compass Maritime is one of ten worldwide panel members on the Baltic Exchange Sale & Purchase Assessment Panel (BSPA) and one of six panel members of the Baltic Exchange Demolition Assessment Panel (BDA). Compass Maritime's weekly data is included in the calculation of the respective Baltic Exchange ship valuation indices.

Valuations by Compass Maritime have been utilized in the prospectuses for the Initial Public Offerings (IPO) in the stock exchanges in the United States and overseas, annual reports of publicly traded companies, in the issuing of equity and debt (bonds), including valuations based on the Pfandbrief Act in Germany.

Compass Maritime provides the following types of vessel valuations:

- **Market Approach** (basis prompt, charter-free delivery)
- **Income Approach**. Our income approach valuation can entail detailed financial modeling on the calculation of future vessel earnings, calculation of discount rate & Weighted Average Cost of Capital (WACC) – even in cases that the interest expense is tied to LIBOR rates, and modeling on vessel residual values including statistical and VAR analysis.
- **Replacement Cost Method**
- **Discounted Cash Flow Analysis** (DCF)
- **Long Term Asset Value** (LTAV) under Hamburg Shipbrokers Association Rules

To obtain a valuation, please contact valuations@compassmar.com

Compass Maritime Services
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, NJ 07666 USA

Tel: 201.907.0009
Fax: 201.907.5009

www.compassmar.com



# COMPASS MARITIME SERVICES
SPECIALISTS IN THE SALE, PURCHASE AND VALUATION OF SHIPS AND OFFSHORE VESSELS

## DESKTOP VALUATION CERTIFICATE

We would estimate fair market value as of February 8, 2021 as follows:

mv "BEIJING"
------------------------
Malta flag Neo-Panamax Containership
Deadweight: 107,503 mts on 15 m draft
Built in 2006 at Hyundai Heavy Industries in Korea
Class: DNV
IMO: 9308508
Gross: 109,149 / Net: 52,743
LOA: 350.55 m - Breadth 42.87 m - Depth 27.3 m
TEU: 9,469
Cargo Handling: 700 Reefer Plugs
Main engine: MAN-B&W 12K98MC 101,644 BHP
Generators: 2,3
LDT: 36,973 MT

(Details given in good faith but without guarantee)

========================================================
FAIR MARKET VALUE as of February 8, 2021: $ 36,000,000
(Thirty-six million United States dollars)
========================================================

Compass Maritime Services
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, NJ 07666 USA

Tel: 201.907.0009
Fax: 201.907.5009

www.compassmar.com



# COMPASS MARITIME SERVICES
### SPECIALISTS IN THE SALE, PURCHASE AND VALUATION OF SHIPS AND OFFSHORE VESSELS

## IMPORTANT DISCLAIMER

The valuation takes into consideration the Market, Income, & Cost approaches to value. That is to say, we will review the current and potential earnings of the vessel as well as the costs of replacing the asset.  Under certain circumstances, there is a wide spread between a willing buyer's "bid" and a willing seller's "ask". In these instances, we will weigh the different valuation approaches described above differently. The specific weighting will vary depending on the current market conditions and trends and the reliability and applicability of each approach at that time. It must be noted that the value of vessels can change very quickly and dramatically depending on the prevailing market conditions.

The valuation is valid only on the date first written above. No assurances can be given that the valuation will be sustained or is realizable in an actual transaction. COMPASS MARITIME SERVICES, LLC assumes that the vessel has been maintained in accordance with good commercial practice and is in class, in good working order, with all necessary trading certificates for world-wide trading, with her hull, machinery and equipment in a condition to be expected of a vessel of her age and type, in fair survey position and prepared for prompt charter free delivery in a commercial loading zone and free of any encumbrances, mortgages, liens, debts or claims whatsoever.

Neither COMPASS MARITIME SERVICES, LLC, nor the individual making the evaluation has inspected the vessel, her position of records or made any other independent inspection, investigation or examination whatsoever with respect to the vessel. Any interested party should conduct an independent inspection and investigation of the facts concerning the vessel. No one should rely on this value as a substitute for their own due diligence.

The evaluation is provided solely for the use of the persons to whom it is addressed. The value is to be used only for the specific purposes stated and any other use is invalid. No reliance may be made by any third party without our prior written consent.

COMPASS MARITIME SERVICES, LLC
=========================================================
=========================================================

Compass Maritime Services
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, NJ 07666 USA

Tel: 201.907.0009
Fax: 201.907.5009

www.compassmar.com

Page | 3

# EXHIBIT "B"

FOUNDED 1894

# JACQ. PIEROT JR. & SONS, INC.



BROKERS FOR THE SALE, PURCHASE, FINANCE AND CONSTRUCTION OF SHIPS • APPRAISALS

228 EAST 45TH STREET
SUITE 1801
NEW YORK, NY 10017

TEL:  (212) 344-3840
FAX:  (212) 943-7394
E-MAIL: SNP@PIEROTSHIPPING.COM
     PIEROT@PIEROTSHIPPING.COM
WEB:  WWW.PIEROTSHIPPING.COM

## Valuation Certificate.

<div style="writing-mode: vertical">THIS CERTIFICATE IS ISSUED SUBJECT TO THE TERMS, CONDITIONS AND EXCEPTIONS NOTED ON THE REVERSE SIDE HEREOF</div>

Name of Vessel: **m/v BEIJING**  (IMO# 9308508)      Flag: **Maltese**

Type: **Container Ship**

Deadweight about **113,939 m** tons on **15 m SSW** draft.

Gross tons **109,149**   net tons **52,743**

Dimensions **350.5m LOA / 42.8m Beam / 27.3m Depth**

Built **6/2006** by **Hyundai Heavy Industries Co. Ltd.,**

**Ulsan, South Korea**

Classed **DNV-GL** Special Survey **& Bottom Survey due 8/20/2021***

Decks **One**

Engines **MAN-B&W 12K98MC - 101,748HP / 74,757kW**

Location of Engines **Aft**

Boilers **N/A**

Speed Loaded about __-__ knots on about __-__ tons __-__ per day.

- Gearless

- TEUS: 9,469

- Charter Free

***due as of the date for which the Vessel is being evaluated**

We are of the opinion that the fair and reasonable market value of the above

vessel, in **Sound & Seaworthy** Condition, as at **8th February 2021 was**

**US$ 40,000,000.00** (    **FORTY MILLION**

**UNITED STATES DOLLARS** )

<div style="writing-mode: vertical">THIS CERTIFICATE IS ISSUED SUBJECT TO THE TERMS, CONDITIONS AND EXCEPTIONS NOTED ON THE REVERSE SIDE HEREOF<br>THIS OPINION IS SOLEY FOR THE USE OF THE CLIENT TO WHOM IT IS ISSUED.</div>

JACQ. PIEROT JR. & SONS, INC.

Dated this **17th** day of **May 2022**

"The valuation set forth on the front of this Certificate is solely a statement of our opinion of the fair and reasonable market value of the subject vessel for prompt charter free (unless otherwise noted) delivery at the location specified (if any) as at the date noted. In giving such opinion we have assumed in all respects the accuracy of the information concerning the characteristics and condition of the subject vessel set forth in this Certificate. Our opinion is based in part on such information as published in standard reference works or obtained by us from such other sources as we have deemed appropriate. We assume no responsibility whatsoever for the accuracy of any information concerning the vessel. We note that the information available in published reference works may be inaccurate or out-of-date. We have conducted no inspection of the vessel or of the vessel's classification society records. We have assumed that the vessel is in the condition noted in this Certificate solely for the purpose of expressing our opinion as to the vessel's value in such condition and it is to be understood that we express no opinion as to the actual condition of the vessel in any respect. Nothing contained in this Certificate constitutes any representation or warranty as to condition, value or any other fact or matter, and no one is entitled to rely on any statement or matter contained in this Certificate as a representation or warranty made by us. All persons are cautioned to conduct such independent investigation as they may deem necessary in order to determine the accuracy of any statements, matters or opinions set forth in this Certificate."

# EXHIBIT "2"

ALBERT E. PEACOCK III, CASB No. 134094
apeacock@peacockpiper.com
GLEN R. PIPER, CASB No. 204023
gpiper@peacockpiper.com
DAVID A. TONG, CASB No. 238971
dtong@peacockpiper.com
MARGARET STANDO, CASB No. 343038
mstando@peacockpiper.com
**PEACOCK PIPER TONG + VOSS LLP**
100 W. Broadway, Suite 610
Long Beach, CA  90802
Telephone: (562) 320-8880
Facsimile: (562) 735-3950

Attorneys for Plaintiff,
CAPETANISSA MARITIME CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| In re the Matter of the Complaint of CAPETANISSA MARITIME CORPORATION, Owner of the Motor Vessel BEIJING, and its engines, tackle, apparel, and appurtenances, for Exoneration from, or Limitation of, Liability,<br><br>Plaintiff, | Case No.<br>_Action Filed:_ May 20, 2022<br><br>**DECLARATION OF JOHN HARRY WEBSTER IN SUPPORT OF THE THEN-PENDING FREIGHT VALUE AND CAPETANISSA MARITIME CORPORATION'S COMPLAINT FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY**<br><br>**IN ADMIRALTY** |

1     I, JOHN HARRY WEBSTER, do hereby declare and state as follows:

2     1.    I am an individual over the age 18 residing in Greece.

3     2.    I have personal knowledge of all facts stated in this Declaration, except for

4 those facts, if any, stated upon information and belief.

5     3.    I provide this declaration in support of Plaintiff CAPETANISSA

6 MARITIME CORPORATION'S ("*Capetanissa*") Complaint in an action for

7 exoneration from, or in the alternative, limitation of liability, either civil or maritime,

8 pursuant to the Limitation of Liability Act of 1851, 46 U.S.C. §§30501, *et. seq*.

9     4.    I am employed by Costamare Shipping as "Legal Counsel." I have served

10 in this role since 16 September 2020.

11     5.    In my capacity as Legal Counsel at Costamare Shipping, my job duties and

12 responsibilities include providing broad support and advice to the single vessel owning

13 subsidiaries of Costamare Inc., and the vessels they own, including the M/V BEIJING

14 (the "*BEIJING*"), which is owned by Capetanissa, in relation to their business,

15 corporate good standing and governance, commercial contract negotiations, finance and

16 tax matters, insurance, and claims management.

17     6.    Based on my role as Legal Counsel at Costamare Shipping, I have personal

18 knowledge concerning Capetanissa's business operations as well as its contracts.

19     7.    Capetanissa's business as the owner of the BEIJING is chartering (akin to

20 leasing out) that vessel to third party entities known as "charterers." These charters are

21 documented in contracts known as "charter parties."

22     8.    During the subject voyage to Los Angeles – Long Beach in January 2021,

23 the BEIJING was time chartered to a third party under a New York Produce Exchange

24 Time Charter Party (aka a NYPE) form (hereinafter referred to as the "*Charter Party*").

25     9.    I have reviewed the Charter Party in connection with preparing this

26 declaration.

27 ///

28 ///

- 1 -

10.     Capetanissa is not involved in the booking of cargo for carriage on the BEIJING.  Capetanissa does not receive payments from the third parties that ship their cargo onboard the BEIJING.  The payments for carriage of cargo on the BEIJING are paid to the charterers.

11.     Capetanissa's revenue consists of the daily "hire" or lease payments it receives from the charterers for use of the BEIJING.  Under the terms of the Charter Party, as in force at the time, Capetanissa received daily hire payments from the charterer in the amount of $15,800.00.  Capetanissa did not and does not receive any other payments.  The daily hire payment was the same regardless of where the BEIJING traveled in the world.  Thus, Capetannissa does not receive any extra or any higher daily hire payments if the charterers send the BEIJING to ports in the United States of America, including the ports of Los Angeles and Long Beach.

12.     Based upon a review of relevant documents, including the BEIJING's historical schedule for the voyage at issue, the BEIJING departed Xiamen, China on 6 January 2021 to commence its voyage, known as "Voyage 084E" (hereinafter, the "*Voyage*").  During the Voyage, the BEIJING stopped at Yantian, China on 7 January 2021, and then sailed to the United States.  It arrived at Long Beach on 23 January 2021.  Upon the completion of cargo operations at the Port of Long Beach, the BEIJING departed and began a new voyage to China on 8 February 2021, thus terminating the Voyage on 8 February 2021 (the "*Voyage End Date*").

13.     In total the Voyage was 34 days long, inclusive of the Voyage End Date.

14.     I was asked to calculate the amount of hire received by Capetanissa from the charterer for the Voyage.  To perform this calculation, I used the amount of hire earned by Capetanissa during the Voyage which consisted of a daily hire rate of $15,800 under the terms of the Charter Party and I multiplied that daily hire rate by the number of days for the Voyage.  Therefore, the total hire earned by Capetanissa for the Voyage was $537,200 (34 days x $15,800/day = $537,200).

///

1    15.    I did not reduce the calculation to account for any commissions and costs

2 incurred by Capetanissa during the Voyage.

3

4

5    I declare under penalty of perjury under the laws of the United States of America

6 that the foregoing is true and correct.

7

8    Executed 19 May 2022, in Athens, Greece.

9

10    _____

11    JOHN HARRY WEBSTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28